**E-FILED**
Monday, 22 February, 2016  08:50:17 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| BRIAN E. SHINNEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-3180 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Brian E. Shinneman appeals from the denial of his application for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income Disability Benefits (SSI) under Titles II and XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Shinneman has filed an Amended Motion for Summary Judgment (d/e 20), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 17).  The matter is before this Court for a Report and Recommendation.  For the reasons set

forth below, this Court recommends that the Decision of the Commissioner should be AFFIRMED.

## STATEMENT OF FACTS

Shinneman was born on January 10, 1963.  Shinneman graduated from high school and truck driver training school.  He previously worked as a truck driver.  Certified Transcript of Proceedings before the Social Security Administration (d/e 9) (R.) 56-57.  Shinneman last worked some time before June 19, 2005.  R. 57, 180, 454.  On March 29, 2011, Shinneman applied for Disability Benefits.  Shinneman alleged that he became disabled on June 19, 2005 (Onset Date).  The last date on which Shinneman was insured for DIB benefits was December 31, 2005 (Last Date Insured).  Shinneman suffers from cardiomyopathy, pulmonary hypertension, interstitial lung disease, diabetes, chronic obstructive pulmonary disease (COPD), obesity, degenerative joint disease, and sleep apnea.  R. 22, 24, 347.

## MEDICAL TREATMENT PRIOR TO LAST DATE INSURED (DECEMBER 31, 2005)

On March 9, 2005, Shinneman was seen at the Community Health Improvement Center in Decatur, Illinois.  R. 437-39.  At that time Shinneman weighed 382 pounds.  On examination, Shinneman had no

acute distress, his heart was normal, he had no edema, his breathing was normal.  Shinneman's diabetes was controlled at that time.  R. 438.

On March 23, 2005, Shinneman was seen at the Community Health Center for a blood pressure check.  At the time, Shinneman weighed 382 pounds, and his blood pressure was 142/84.  He had no edema in his extremities.  R. 436.

On April 13, 2005, Shinneman was seen at the Community Health Center for a blood pressure check.  His blood pressure was 140/90.  He had no edema in his extremities.  R. 435.

On May 26, 2005, Shinneman was seen at the Community Health Center to get his prescription for blood pressure medicine refilled.  At that time, he weighed 380 pounds and had a blood pressure of 148/90.  He had no edema at that time.  R. 434.

On June 22, 2005, Shinneman was seen at the Community Health Center.  Shinneman had not taken his medications on the day of the visit. His blood pressure was 150/100.  He had no edema in his extremities. R. 433.

On October 7, 2005, Shinneman was seen at the Community Health Center for a physical examination.  His examination was normal.  He was in

no acute distress.  His heart rate was normal and regular, his breathing was normal, and he had no edema or swelling in his extremities.  R. 432.

On November 10, 2005, Shinneman was seen at the Community Health Center for his diabetes.  His blood pressure was 165/100.  He had no edema in his extremities.  His medications were adjusted.  R. 430.

MEDICAL TREATMENT SUBSEQUENT TO
LAST DATE INSURED (DECEMBER 31, 2005)

On March 31, 2006, Shinneman was seen at the Community Health Improvement Center.   At that time, Shinneman measured 5 feet 10 inches and weighed 350 pounds.  R. 429.  The handwritten notes from the visit are largely illegible.  The legible portions of the notes indicate that Shinneman was non-compliant with the prescribed treatment.  The notes also state that Shinneman had edema and wounds in his lower extremities and hypertension.  The notes also indicate that Shinneman refused to stop his tobacco use.  R. 429.

On April 2, 2006, Shinneman went to the emergency room (ER) at the Decatur Memorial Hospital in Decatur, Illinois, complaining of shortness of breath.  Shinneman reported that his shortness of breath increased with exertion.  Shinneman reported that he could not walk more than ten feet that morning.  Shinneman reported coughing up brown sputum for four days.  Shinneman had sores on his legs and abdomen.  R. 295-96.  An

x-ray of his chest showed mildly prominent central interstitial markings.

R. 299.  The ER physician diagnosed pneumonia and hypoventilation.

R. 295.  Shinneman was admitted to the hospital for hypoxia and lower

extremity cellulitis.

During his stay at the hospital, an echocardiogram showed mild left

ventricle hypertrophy (LVH) with normal left ventricle (LV) systolic function,

mildly dilated left atrium, mild tricuspid regurgitation with pulmonary

hypertension, and mildly dilated right-sided chambers consistent with

chronic cor pulmonale.  R. 340-41.[1]  A sleep study showed severe sleep

apnea.  The sleep apnea was significantly improved with use of a

continuous positive air pressure (CPAP) machine.  R. 347.

Shinneman was discharged on April 10, 2006.  His cellulitis was

resolving.  He was prescribed medication and a home CPAP machine.

R. 302-03.  The hospital notes characterized Shinneman as morbidly obese

and noted that he was diabetic.   The final discharge diagnoses were

bilateral lower extremity cellulitis, sleep apnea, diabetes mellitus Type II,

dyslipidemia, morbid obesity, and nicotine dependence.  R. 302.  He was

encouraged to increase his activity to lose weight and maintain compliance

with his medications.   R. 303.

---

[1] Cor pulmonale is an enlargement of the right ventricle (lower right chamber of the heart) because of disease in the lungs.  American Medical Association, Complete Medical Encyclopedia (2003 ed.) (AMA Encyclopedia), at 405.

On August 20, 2008, Shinneman was seen at the Community Health Improvement Center.  Shinneman was seen for evaluation and management of his hypertensive cardiovascular disease.  Shinneman reported that he was compliant with his blood pressure medication.  His blood pressure was 148/86.  The planned goal pressure was 130/80.  Shinneman denied any symptoms from his blood pressure.  Shinneman also denied feeling tired or fatigued.  He denied any chest pain, dyspnea, palpitations, edema or orthopnea.[2]  He denied any cough, hemoptysis or wheezing.  He denied any dysuria, urgency, frequency or nocturia.[3]  He denied any weakness or headaches.  He also denied any numbness or tingling in his arms or legs.   On examination, Shinneman was in no acute distress, his respiration was even and nonlabored, and no edema was noted.  Shinneman's blood pressure medicine was adjusted and a recheck in two to three weeks was planned.  R. 406.

On August 28, 2006, Shinneman underwent a pulmonary function test.  Shinneman's FEV1 was 3.24 L.  R. 390.  The term FEV1 means one-second forced expiratory volume.  20 C.F.R. Part 404 Subpart P, Appendix 1, § 3.00E.

---

[2] Dyspnea is shortness of breath.  20 C.F.R. Part 404, Subpart P App. 1, §12.00D(2)(b)(i).  Orthopnea is difficulty breathing while lying down.  AMA Encyclopedia, at 926.
[3] Dysuria is painful or difficult urination.  Nocturia is the need to urinate at night.  AMA Encyclopedia, at 489, 904.

On January 19, 2009, Shinneman was seen at the Community Health Improvement Center for evaluation and management of his hypertensive cardiovascular disease.  Shinneman had previously run out of blood pressure medicine.  He was given medication and returned for this visit a few days later.  His blood pressure was 139/95.  Shinneman denied feeling tired or fatigued.  He denied any chest pain, dyspnea, palpitations, edema or orthopnea.  He denied any cough, hemoptysis or wheezing.  He denied any dysuria, urgency, frequency or hematuria.  He denied any headaches. On examination, Shinneman was in no acute distress, his respiration was even and nonlabored, and he had no peripheral edema.  His diabetes and blood pressure medicines were adjusted.  R. 403.

On February 26, 2009, Shinneman was seen at the Community Health Improvement Center.  He weighed 388 pounds at that time.  R. 402. Shinneman reported that he was feeling fine.  On examination, Shinneman was in no distress and his respiration was clear.  He had some pitting edema bilaterally on his lower legs.  He was diagnosed with hypertension and diabetes.  He was given a diuretic and told to elevate his feet.  He was also told to adjust his diet by reducing salt and pasta and increasing vegetables and salads.  R. 402.

On October 20, 2009, Shinneman was seen at the Community Health Improvement Center.  At his last appointment, Shinneman had not been taking his blood pressure medicine.   He reported that he had been taking his blood pressure medicine for the last month before this visit.  His blood pressure was 142/82.  Shinneman denied feeling tired or fatigued.  He denied having any shortness of breath or dyspnea on exertion.  He denied any coughing, wheezing or hemoptysis.  He denied any dysuria, urgency, frequency or hematuria.  On examination, Shinneman was in no acute distress, and his respiration was even and nonlabored.  His heart rhythm was regular and in rate.  He had no peripheral edema.  R. 398.

On August 18, 2010, Shinneman was seen at the Community Health Improvement Center.  Shinneman reported that he was noncompliant with his diabetic diet.  Shinneman denied any polyuria or polydipsia.[4]  He denied any chest pain.  He reported some shortness of breath with exertion, "but this is nothing new."  He reported some fatigue, particularly with exertion. He had not been taking his blood pressure medicine for two days before the visit.  Shinneman reported that he was using his CPAP machine.  On examination, his vital signs were stable.  He weighed 386 pounds.  His examination was normal.  He had no edema.  R. 392.

---

[4] Polyuria is passing large volumes of urine.  Polydipsia is intense and constant thirst over extended periods of time.  AMA Encyclopedia, at 1005, 1007.

On March 29, 2011, Shinneman applied for Disability Benefits.  R. 22.
On May 18, 2011, Shinneman completed a form detailing his daily
activities.  R. 229-36.[5]  Shinneman stated that his daily activities consisted
of taking his dog outside to play and for walks, feeding his dog, eating,
taking his medications, playing on the computer, and watching one hour of
television in the evening.  R. 229.  Shinneman stated that he had no energy
due to his condition.  He stated that he wore an oxygen mask to sleep at
night.  R. 229.  Shinneman indicated that he did not cook, but then stated
that he prepared his food or meals daily.  Shinneman stated that he did
laundry, mowing, and some house repairs.  He said that it took all day to
perform these tasks.  Shinneman stated that he went out driving, but not
alone because of gas prices.  Shinneman stated that he went shopping for
food.  He said he shopped for about 30 minutes at a time.  R. 231.
Shinneman listed his hobbies as cards, coupons, and "WWII."  R. 232.
Shinneman stated that he went to the coffee shop on a regular basis.
R. 232.  Shinneman stated that he could walk 100 yards before he needed
to rest.  He stated that he could pay attention for one hour.  He stated that
he finished what he started.  He stated that he followed written instructions
well, but not spoken instructions.  R. 233.  Shinneman stated that he got

---

[5] Shinneman dated the document with his birthdate January 10, 1963.  R. 235.  The date stamped on the
first page of the document is May 18, 2011.  R. 229

along with authority figures. He handled stress by leaving.  He could handle changes in his routine.  R. 234.

On May 22, 2011, Shinneman's mother Mary Jane Woodard completed a Function Report—Adult—Third Party form.  R. 237-44. Woodard stated that Shinneman was homeless.  She stated that he stayed with her occasionally.  She stated that Shinneman's legs hurt, he needed oxygen to sleep, and he had trouble walking.  R. 237-38.  She stated that Shinneman could take care of his personal hygiene and could dress and feed himself.  She stated that Shinneman prepared his own meals.  She stated that he did laundry, general cleaning, and mowing on a riding mower.  She stated that he took the "usual amount of time" to complete these tasks.  R. 239.  She stated that he drove and played computer games and card games.  She stated that he went to the coffee shop daily. R. 240-41.  She stated that he could walk "about ½ mile or 10 min." before needing to rest.  She stated that he then needed to rest about twenty minutes.  She stated that he could pay attention "as long as necessary." She also stated that he followed written and spoken instructions well and finished what he started.  R. 242.

On June 7, 2011 Shinneman was seen at the Community Health Center.  The note states that Shinneman "has past medical history

significant for diabetes mellitus, hyperlipidemia, hypertension, and noncompliance."[6]  Shinneman denied any polyuria, polydipsia, chest pain, or shortness of breath.  On examination, Shinneman was morbidly obese, his heart had a regular rate and rhythm, his lungs were clear, and he had no edema.  R. 440.

On June 29, 2011, state agency physician Dr. C.A. Gotway, M.D., prepared a Physical Residual Functional Capacity Assessment of Shinneman.  R. 444-51.  Dr. Gotway opined that Shinneman had the residual functional capacity (RFC) to lift fifty pounds occasionally and twenty five pound frequently; to stand and/or walk six hours in an eight-hour workday; to sit for six hours in an eight-hour workday; to occasionally climb ramps, stairs, ladders, ropes, and scaffolds.  Dr. Gotway opined that Shinneman had no other physical functional limitations.  R. 444-50.  The Social Security regulations define "medium work" as the ability to lift and carry fifty pounds occasionally and twenty five pounds frequently.  See 20 C.F.R. §§ 404.1567(c), 416.967(c).

On June 29, 2011, Dr. Gotway also opined that insufficient evidence existed to assess Shinneman's physical functional limitations as of December 31, 2005.  R. 441.

---

[6] Hyperlipidemia is elevated levels of fats (lipids) in the blood.  AMA Encyclopedia, at 691.

On August 14, 2011, Shinneman's mother Woodard completed a second Function Report—Adult—Third Party form.  R. 253-60.  She stated that Shinneman could not stand for long periods and he could not tolerate heat for long.  R. 253.  She stated that he spent his days playing computer games and going to the coffee shop.  R. 253-54.  She stated that he had no problem taking care of himself.  She stated that he prepared his own meals.  She stated that he took the normal amount of time to prepare meals.  She stated that he cooked much less since his condition got worse. R. 255.  She stated that he did laundry, made his bed, and did some cleaning.  She did not know how long he took to complete these tasks. R. 255.  She said that he went out daily.  He shopped for groceries.  She stated that he could walk "only a block or two."  She stated that he then needed to rest ten or fifteen minutes.  R. 258.  She stated that he "has trouble lifting, squatting, bending, standing, climbing stairs and kneeling." She stated that he had the normal ability to pay attention and follow instructions.  She stated that he finished what he started.  R. 258. Woodard stated that Shinneman had trouble finding work because of his health.  She also stated that he could not sit for very long and could not work in the heat or be on his feet for long.  She stated that as a result he

could not work.  She stated that he could not drive a "semi" because of his diabetes.  R. 260.

On September 22, 2011, state agency psychologist Dr. Dolores Trello, Psy.D., performed a mental status examination of Shinneman. R. 453-56.  Shinneman reported that his major problems were diabetes, obesity and sleep deprivation.  He stated that he was a recovering alcoholic and addict.  He stated that he regularly attended Alcoholics Anonymous (AA) meetings.  He reported that he had been sober six years at the time of the examination.  He also reported, however, that he was arrested two times four years before the examination for possession of cocaine and drug paraphernalia.  R. 456.  He reported that he experienced auditory and visual hallucinations.  He referred to the hallucinations as "ghosts and spirits."  R. 453.  He reported at one point that he has experienced the ghosts and spirits for the last six years, but at another point said that he has experienced them since childhood.  R. 456.

Shinneman reported to Dr. Trello that he last worked in 1996.  He was a truck driver.  He stated that he could not work because he could not stand on his feet.  Shinneman reported that he was "able to cook, bathe, do laundry, do house chores, purchase food, pay bills, drive and get around,

make change and handle a budget.  He can concentrate on a task to completion."  R. 454.

Dr. Trello diagnosed Shinneman with a history of polysubstance dependence and adjustment disorder with anxious mood.  Dr. Trello assessed Shinneman with a Global Assessment of Functioning (GAF) score of 50.[7]  Dr. Trello noted, "Serious problems in vocational and interpersonal functioning."  R. 455.  Dr. Trello also recommended that, "His ghosts/spirits need further evaluation."  R. 456.

On September 30, 2011, agency psychologist Dr. Donald Henson, Ph.D., prepared two Psychiatric Review Techniques for Shinneman.  The first Psychiatric Review Technique assessed Shinneman's current condition.  R. 457-70.  The second Psychiatric Review Technique assessed Shinneman's condition as of December 31, 2005.  R. 471-84.  Dr. Henson opined that Shinneman then currently had non-severe mental impairments of adjustment disorder, affective disorders and substance addiction disorders.  R. 457, 460.  Dr. Henson opined that Shinneman's then current mental disorders caused mild restrictions or limitations on Shinneman's functional abilities.  R. 467.  Dr. Henson opined that, as of December 31,

---

[7] The GAF score was a measure of a clinician's judgment of an individual's overall level of functioning on a hypothetical continuum of mental health and illness.  American Psychiatric Assn, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev.) at 32-35.  The American Psychiatric Association no longer recommends use of the GAF score.  Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), at 16.

2005, insufficient evidence existed to establish that Shinneman had any mental disorders or any functional limitations due to his mental condition. R. 471, 481.

On October 5, 2011, agency physician Dr. Lenore Gonzalez, M.D., affirmed Dr. Gotway's opinions.  R. 486.

On March 5, 2012, Shinneman was seen at the Community Health Improvement Center.  Shinneman had not been to the Center for nine months.  He came for a refill of his prescriptions.  He weighed 379 pounds. On examination, Shinneman had "bilateral +1 pretibial edema probably to just below the patellas."  His feet were cold, but a pulse could be felt.  His pedal pulses were palpated and feet were sensitive monofilament examination test.  R. 488.

On November 3, 2012, Shinneman's retained expert physician, Dr. Julian Freeman, M.D., prepared a statement of his opinions of Shinneman's disability status and RFC.  R. 286-89.  Dr. Freeman based his opinions on a review of Shinneman's medical records and other evidence submitted to the Social Security Administration.  R. 286.  Drs. Gotway, Henson, and Gonzalez also based their opinions on a review of the medical records and other evidence submitted to the Social Security Administration.

Dr. Freeman opined that Shinneman was disabled as of June 2005 because his condition medically equaled the Social Security regulation's Listing for chronic heart failure.  The Social Security regulations contain a list of criteria of impairments that are so severe that an unemployed person whose condition meets or is medically equal to one of the listed criteria is disabled regardless of his age, education, or work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  The list of these criteria is set forth at 20 C.F.R. Part 404 Subpart P, Appendix 1, and is referred to collectively as the "Listings."  Each individual set of criteria for a specific condition is referred to as a "Listing."

The Listing for chronic heart failure, Listing 4.02, is as follows:

4.02 Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of severity for this impairment is met when the requirements in both A and B are satisfied.

A. Medically documented presence of one of the following:

1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or

2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);

AND

B. Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R. Part 404, Subpart P, App. 1, Listing 4.02.  An "MC" is a medical

consultant.  Listing § 4.00A(3)(a).  The term "MET" means metabolic

equivalent.  MET is a measurement of a person's maximal aerobic

capacity.  Listing § 4.00C(3)(a).  Systolic function refers to when the heart

is contracting, and diastolic function refers to when the heart is relaxed.

See AMA Encyclopedia, at 465 and 1187.

Dr. Freeman opined that Shinneman's condition was medically equal

to the criteria set forth in Listing 4.02:

> While the left atrial dimension is better than the listing
> requirement, the interstitial lung disease and cor pulmonale add
> a very high level of shortness of breath with minimal exertion,
> and would preclude all but minimal activity.  At the [March 2006]
> hospitalization where this data were obtained, congestive heart
> failure was absent (completely normal BNP level, no pulmonary
> edema).  Since that time, however, right heart congestive
> failure has appeared, indicated by the extensive edema.
>
> Reports on level of activity in the setting of these conditions are
> in conflict with one another.  The individual states he is limited
> to 100 yards of walking (well under a block) and requires long
> rests after walking that distance.  The witness statements
> include two conflicting reports very close to one another, with
> the first indicating the ability to walk a half mile at a relatively
> fast walking rate, the other indicating lower activity but still
> much greater walking ability than stated by the individual.  Of
> these statements, the one from the individual himself is the one
> most consistent with the echocardiogram, ECG, and chest x-ray
> results, as well as the clinical exam showing edema extending
> to the knees and the level of obesity.
>
> For these reasons, the listing is considered equaled by the
> objective data, with the conclusion based on imaging, weight,

and ECG data alone supported by the description of activity
that is both internally consistent, and most consistent with the
objective data.

R. 288.

Dr. Freeman also rendered an opinion on Shinneman's RFC as of
June 2005.  Dr. Freeman opined that Shinneman could stand and/or walk a
total of thirty minutes a day; rarely lift up to five pounds; never climb; and
rarely make postural changes.  Dr. Freeman further opined that Shinneman
could only perform low stress mental activities with no significant contact
with the general public either in person or by telephone, and could not
perform any activities with "high production rate or quality demands."
R. 289.  Dr. Freeman concluded, "These limitations apply since 2006.  In
2012, with the development of overt edema (congestive heart failure),
exertional function is reduced even further."  R. 289.

On November 13, 2012, the Administrative Law Judge (ALJ)
conducted an evidentiary hearing.  R. 44-83.  The ALJ presided over the
hearing in Peoria, Illinois.  Shinneman and his attorney appeared by
videoconference from Springfield, Illinois.  Vocational expert Robert
Hammond also appeared at the hearing in Peoria.  R. 46.

Shinneman testified first.  He testified that he was 5 feet 9 inches tall
and weighed 255 pounds.  He testified that he has been on a diabetic diet.

R. 54.  He was single and lived in a house with his parents and his brother.

R. 55.  Shinneman testified that he completed high school and truck driving

school.  R. 56.

Shinneman testified that he drove to take his brother to work and to

attend AA meetings.  He attended AA meetings twice a week.  He testified

that he was limited in driving because he had to make frequent stops to go

to the bathroom.  R. 56.

Shinneman testified that he could not remember when he last

worked, but his last day of work corresponded to his alleged onset date in

June 2005.[8]  Shinneman testified that he stopped working because, "I got

fired and just all the medical problems just kind of hit at once."  R. 57.

Shinneman testified that he was fired because the inside of the cab of the

truck he was driving was "cut up with a knife."  R. 57.  Shinneman testified

he cut up the truck because he was trying to kill the ghosts that were

harassing him.  R. 70.

Shinneman testified that he briefly tried working as a laborer, but

stopped because, "Being on concrete, my legs swelled up.  It started

severe pain. Sometimes I couldn't even walk after the shift."  R. 58.

_____

[8] Social Security earnings records indicate he last worked in 2002.  R. 180.

Shinneman testified that he could not work because he was tired all the time, he had to go to the restroom frequently, and his feet often swelled.  R. 58.  He testified that he had to go to the bathroom frequently because he was on a diuretic.  R. 58.  He started the diuretic six months before the hearing.  He testified that he needed to go to the bathroom every thirty to forty-five minutes.  His need to go to the bathroom was the only side effect from his medications.  R. 59-60.

Shinneman testified that his need to go to the bathroom interrupted his sleep at night.  He testified that he slept four to five hours a night.  He took a nap from 12:00 p.m. to 1:00 p.m.  R. 60.  Shinneman later testified that his naps lasted a minimum of two hours.  R. 71.  Shinneman testified that he used a CPAP machine and a separate oxygen machine to sleep. R. 61.  Shinneman testified that he used the oxygen to sleep during the day and night.  Shinneman testified that he did not feel refreshed after sleeping either at night or during the day.  R. 72.  Shinneman testified that he could not stay awake for six hours straight during the day.  R. 76.

Shinneman testified that he had pain in his feet and back.  He testified that he experienced the pain when he stood up too long or lifted something "too heavy."  R. 61.  Shinneman testified that exercise helped

reduce the pain.  He testified that he took the dogs outside to play in order to get some exercise.

Shinneman testified that his feet swelled when he stood up.  He testified that "they're pretty well swollen all the time now."  R. 62.  He testified that his feet stopped swelling and hurting if he sat down "for awhile."  R. 62. He testified that his problem with swollen feet had been ongoing since 2006.  R. 62.

Shinneman testified that his hospitalization in 2006 was the only time he had a complete work-up on his heart condition.  R. 63.  Shinneman testified that he did not experience chest pain.  R. 75.

Shinneman testified that his hallucinations have persisted since 2006. He has not seen any doctor for the problem.  R. 64-65.  He testified that he heard them while he was testifying.  R. 71.

Shinneman testified that he could walk "half a block and I'm huffing and puffing."  He testified that he could lift "[a]bout 20 pounds at one time, but I'd probably take that in stages."  R. 65.  Shinneman testified that he could carry twenty pounds "two or three steps."  Shinneman testified that he could not crouch or stoop.  R. 66.  Shinneman testified that he could not walk up or down stairs.  R. 74.  Shinneman testified that he could not sit in a chair for very long.  R. 75-76.

Shinneman testified that he sometimes had trouble focusing and concentrating.  He testified that he could watch television for thirty minutes and then he had "to get up and move."  R. 67.  Shinneman testified that he would lose focus if he did not take naps during the day.  R. 75.

Shinneman testified that he got along with people well and he could make decisions.  Shinneman testified that he cleaned his room, did laundry, and cooked simple meals like hamburgers.  R. 68.  Shinneman shopped for groceries by himself once a month.  R. 69.  He did not visit with friends.  R. 70.

Shinneman testified that he mowed the lawn using a riding mower. He had to take a break every thirty minutes while mowing.  He got off the mower, walked ten to fifteen feet, and stretched during these breaks. R. 68.

Shinneman testified that he did not go outside during hot or cold weather.  R. 73-74.

Vocational expert Hammond then testified.  The ALJ asked Hammond to consider a situation in which the claimant "could perform 20 pounds maximum lifting and 10 pounds frequently, with occasional stooping, crouching, crawling, balancing, kneeling, occasional climbing ramps and stairs, no ladders, ropes, or scaffold, but only two hours of

standing and walking in an eight hour day."  R. 81.  Hammond opined that

under those conditions, the claimant could not performed his prior truck

driving job, but could perform sedentary jobs such as eye wear polisher

assembler, 2,500 such jobs in Illinois and 96,000 nationally; circuit board

screener, 3,000 such jobs in Illinois and 200,000 nationally; and a sealer in

the pharmaceutical industry, 2,100 such jobs in Illinois and 100,000

nationally.  R. 80-81.  Hammond opined that the claimant could still perform

all of these jobs even if he had the additional limitation that he needed to be

able to sit or stand at his workstation every thirty minutes.  R. 81.

Hammond opined that the claimant could not work if he was off task

twenty percent of the workday due to fatigue.  R. 81.  Hammond also

opined that a person could not work if he was absent more than one and

one-half days per month after a ninety-day probation period.  Hammond

opined that a person could not be absent during the probation period.

R. 82.  The hearing then concluded.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued her decision on December 7, 2012.  R. 22-32.  The

ALJ followed the five-step analysis set forth in Social Security

Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.

Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R. §§

404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that she is disabled

regardless of her age, education and work experience.  20 C.F.R. §§

404.1520(d), 416.920(d).  To meet this requirement at Step 3, the

claimant's condition must meet or be equal to the criteria of one of the

impairments specified in Listings.  20 C.F.R. Part 404 Subpart P, Appendix

1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely

impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work

considering his age, education, work experience, and RFC.  20 C.F.R. §§

404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his

prior work, then Step 5 requires a determination of whether the claimant is

disabled considering his RFC, age, education, and past work experience.

20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The

claimant has the burden of presenting evidence and proving the issues on

the first four steps.  The Commissioner has the burden on the last step; the

Commissioner must show that, considering the listed factors, the claimant

can perform some type of gainful employment that exists in the national

economy.  20 C.F.R. §§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649

F.3d 565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d

345, 352 (7th Cir. 2005).

The ALJ also considered the relevant time frames for determining

eligibility for DIB benefits and SSI benefits.  To be eligible for DIB benefits,

the claimant must be disabled prior to his Date Last Insured.  The date last

insured depends on the claimant's work history.  <u>See</u> 42 U.S.C. §

423(c)(1);  20 C.F.R. 404.131.  Shinneman's Date Last Insured was

December 31, 2005.  R. 22.  A claimant may be entitled to SSI benefits

regardless of work history or dates of insurance; however, he may only be

eligible to receive benefits commencing on the date he applied for SSI

benefits.  20 C.F.R. § 416.335.  Shinneman applied for SSI benefits on

March 29, 2011.

The ALJ determined that Shinneman met his burden at Step 1.  The

ALJ determined that Shinneman had not engaged in substantial gainful

activity since the Onset Date of June 19, 2005, and he suffered from the

severe impairments of cardiomyopathy, pulmonary hypertension, interstitial

lung disease, diabetes, COPD, obesity and generative joint disease.  R. 24.

The ALJ found that Shinneman's mental problems were not severe

because Shinneman presented no medical evidence to substantiate his

claims about ghosts and spirits, and because the other evidence in the record found that he got along well with others and had no problems with concentration or engaging in activities of daily living.  R. 25.

At Step 3, the ALJ determined that Shinneman's impairments or combination of impairments did not meet or equal any Listing.  The ALJ considered the Listings for major dysfunction of joints, lung disease, diabetes with peripheral neuropathy, and chronic heart failure.  Listings 1.02, 3.02, 11.14, and 4.02.  The ALJ also considered the effect of Shinneman's obesity.  R. 25-26.

The ALJ found that Shinneman's heart condition did not meet or equal Listing 4.02.  The ALJ found:

> [The evidence in the record] not show the requisite systolic or diastolic failure as well as seriously limited ability to independently initiate, sustain or complete activities of daily living, or three or more separate episodes of acute congestive heart failure within a consecutive 12-month period, or inability to perform an exercise tolerance test at a workload equivalent to 5 METs or less.

R. 26.  The ALJ rejected Dr. Freeman's contrary opinion as follows:

> The undersigned has considered the opinion of the claimant's medical expert who alleged that the claimant's condition did equal Listing 4.02A, 2/B,1.  The echo did not document any diastolic failure.  Further, his activities of daily living are not very seriously limited; the claimant reported to Dr. Trello that he is able to drive, cook, clean, grocery shop, and do laundry. Further, no doctor has concluded that the performance of an exercise test would present a significant risk to the individual.

R. 26 (citations to the record omitted).

The ALJ found at Step 4 that Shinneman had the RFC since June 19, 2005, to perform sedentary work as defined in the regulations, except that he can occasionally climb ramps and stairs; occasionally stoop, kneel, crawl, balance, and crouch; never climb ladders, ropes, or scaffolds; and must avoid exposure to fumes, odors, dust, gases, poor ventilation, and temperature extremes.  R. 26.  The ALJ stated that she based the RFC finding on the medical records and Shinneman's claims of fatigue and shortness of breath:

> The claimant has been limited to sedentary work activity, with only occasional postural activities, to account for his complaints of pain and fatigue, his medically determinable impairments of obesity, cardiomyopathy, hypertension, lung disease, diabetes, COPD, and joint disease, but he has not demonstrated that his impairments would preclude sedentary work activity with these restrictions.  He had further been limited to jobs that do not require concentrated exposure to fumes, odors, dust, gases, poor ventilation, and temperature extremes to account for his lung disease and COPD.  It is also noted that treating provider has repeatedly encouraged him to exercise, and it is doubtful his would be recommended if the claimant's limitations were as serious as he has alleged.

R. 29 (citations to the record omitted).

The ALJ found Shinneman's testimony and his mother's reports were not credible as to the severity of his limitations due to his impairments.

R. 29-30.  The ALJ found that the medical history did not support

Shinneman's claims of complete disability,

> The claimant did have impairments that could be anticipated to
> produce a certain amount of pain and limitations, but the record
> does not demonstrate clearly that he had the significantly
> limited range of motion, muscle spasms, muscle atrophy, motor
> weakness, sensation loss, difficulty ambulating, or reflex
> abnormalities which are associated with intense and disabling
> pain and limitations.  In fact, none of the claimant's physical
> examinations . . . noted these findings.  Further, despite
> allegations of continual shortness of breath, physical
> examinations have consistently noted his lungs to be clear.

 R. 29 (citations to the record omitted).

The ALJ also noted that Shinneman "has not generally received the

type of medical treatment one would expect for an individual experiencing

debilitating pain and limitations."  R. 29.  The ALJ noted that records from

the March 2012 visit to Community Health Improvement Center indicated

that Shinneman had not been seen for nine months.  R. 29.  The ALJ also

noted that Shinneman was noncompliant with his medications at times.

The ALJ also stated that Shinneman's claims of shortness of breath were

inconsistent with his repeated denials of shortness of breath and fatigue at

his medical appointments.  R. 29.  The ALJ concluded his credibility finding

as follows,

> In summary, the medical record does not document ongoing,
> disabling pain, shortness of breath, and fatigue that the
> claimant alleges as the claimant has repeatedly denied having

these symptoms to his doctor, and physical examinations have
not documented any significant findings.

R. 29.

The ALJ considered the opinions of Drs. Gotway and Gonzalez and
found them to support her finding at Step 3 that Shinneman's impairments
did not meet or equal a Listing.  The ALJ stated that she based the RFC on
all the evidence, including medical evidence that was not before these
doctors.  The ALJ stated that Dr. Gotway's opinion limiting Shinneman to
medium work "may be an overstatement of the claimant's abilities given his
weight, cardiac, and breathing condition."  R. 29.

The ALJ rejected Dr. Freemans' RFC determination as not credible to
the extent it was inconsistent with the ALJ's RFC finding.  The ALJ found
that Dr. Freeman's findings were not supported by the medical record.  The
ALJ again noted that Shinneman repeatedly denied any shortness of
breath or fatigue at his medical appointments and also that the records did
not contain significant findings to support the opinion.  The ALJ stated,
"More weight is given to the objective medical findings and reasonable
limitations deduced therefrom."  R. 30.

At Step 4, the ALJ found that Shinneman could not return to his prior
work as a truck driver.  The ALJ concluded that the requirements of driving
a truck exceeded Shinneman's RFC.  R. 30.

At Step 5, the ALJ concluded that Shinneman should be considered a person closely approaching advanced age as of August 1, 2012. Normally, a person is considered closely approaching advanced age when he is 50 years old or older. Shinneman turned 50 on January 10, 2013. The Commission, however, does not apply the age limits mechanically. An older age category may be applied if the claimant is "a few days or a few months of reaching an older age category, and using the older age category would result in a determination that [the claimant is] disabled." 20 C.F.R. 404.1563(b) and 416.963(b). In this case, the ALJ determined that the categories should not be applied mechanically because of his work history and the significant break in earnings. The ALJ found that Shinneman should be placed in the older age category some five months and ten days before his fiftieth birthday. R. 30.

The ALJ determined that prior to becoming a person closely approaching advanced age on August 1, 2012, Shinneman could perform a significant number of jobs in the national economy. The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 22, and the testimony of vocational expert Hammond. The ALJ found that Shinneman could have performed the polisher, circuit screener, and sealer

jobs identified by Hammond.  R. 31.  The ALJ concluded that Shinneman
was not disabled prior to that date.  R. 32.

The ALJ determined that after Shinneman became a person closely
approaching advanced age on August 1, 2012, he was disabled.  The
Medical-Vocational Guidelines Rule 201.14 established that a person of
Shinneman's age category, education, work experience, and an RFC
limiting him to sedentary work was disabled.  R. 32.

The ALJ, therefore, concluded that Shinneman was not disabled for
DIB because he was not disabled on or before his Date Last Insured of
December 31, 2005, but was disabled for purposes of SSI after August 1,
2012.  R. 32.

Shinneman appealed the ALJ's decision.  On December 19, 2013,
the Appeals Council denied Shinneman's request for review.  The decision
of the ALJ then became the final decision of the Defendant Commissioner.
R. 4.  Shinneman then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine
whether it is supported by substantial evidence.  Substantial evidence is
"such relevant evidence as a reasonable mind might accept as adequate"
to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  At Step 3, the ALJ found that Shinneman did not meet the Listing 4.02 for chronic heart failure, quoted above.  Listing 4.02 requires in subpart (A) specific diastolic or systolic heart function test measurements, and also requires in subpart (B) one of three indications of physical limitations: an inability to initiate and sustain activities of daily living; three acute congestive heart failure events in one twelve month period; or an inability to perform an exercise test.  The April 2006 echocardiogram and other testing did not meet either the systolic or diastolic requirements in Listing 4.02(A).  The ALJ explained the basis for her finding that Shinneman did not meet any of the three conditions described in subpart B.  Shinneman told Dr. Trello that

he was able to drive, cook, clean, grocery shop, and do laundry.  This evidence supported the ALJ's finding that Shinneman could initiate and sustain activities of daily living.  The ALJ observed that no doctor has concluded that the performance of an exercise test would present a significant risk to Shinneman.  The ALJ also observed that Shinneman did not have the required three episodes of acute congestive heart failure in a twelve-month period.  The ALJ also noted that no medical consultant concluded that Shinneman would be at risk to take an exercise test.  This evidence constituted substantial evidence to support the ALJ's finding that Shinneman's condition did not meet or equal Listing 4.02.

At Step 4, the ALJ's RFC determination was supported by substantial evidence.  Drs. Gotway and Gonzalez opined that Shinneman could perform medium work with few postural limitations.  R. 444-50, 486.  These opinions support the ALJ's basic finding that Shinneman could perform some work activities.[9]  The ALJ, however, took into consideration Shinneman's obesity, his heart condition, and his COPD; and gave some credence to Shinneman's testimony about his limitations caused by his symptoms.  See SSR 02-1p (directing the ALJ to take obesity into consideration in her determination process); SSR 96-7p (directing the ALJ

---

[9] See 20 C.F.R. §§ 404.1567(c), 416.967(c) (The ability to perform medium work also indicates the ability to perform sedentary work).

to take into consideration the claimant's testimony about his symptom's effect on his functional limitations).  The ALJ also considered the medical evidence after the dates of Drs. Gotway and Gonzalez's opinions.  The March 2012 examination showed significant edema.  Taking all of this evidence into account, the ALJ lowered the exertional level to sedentary, added exertional limitations, and added environmental limitations.  The ALJ must make these types of determinations from the medical evidence in order to arrive at findings.  See Seamon v. Astrue, 364 F. App'x 243, at 248 (7th Cir. 2010) ("An ALJ may not 'play doctor' by substituting his opinion for that of a physician.  The ALJ, however, is not only allowed to, but indeed must, weigh the evidence and make appropriate inferences from the record.").  The ALJ's RFC determination was supported by substantial evidence.  The resulting conclusion that Shinneman could not return to his past work as a truck driver is supported by Hammond's opinion.

The ALJ's decision at Step 5 was supported by the RFC finding, the Guidelines, and Hammond's testimony that a person with Shinneman's RFC, age, education, and experience could perform jobs that exist in the national economy.  The ALJ's decision that Shinneman was not disabled before August 12, 2012, but was thereafter disabled was supported by substantial evidence.

Shinneman argues that the ALJ erred in his credibility finding.  This
Court will not review the credibility determinations of the ALJ unless the
determinations lack any explanation or support in the record.  Elder v.
Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ explained that
Shinneman's primary claims of fatigue and shortness of breath were
inconsistent with the medical records.  The ALJ stated:

> In summary, the medical record does not document ongoing,
> disabling pain, shortness of breath, and fatigue that the
> claimant alleges as the claimant has repeatedly denied having
> these symptoms to his doctor, and physical examinations have
> not documented any significant findings.

R. 29.  The medical records contain numerous medical examinations from
2005 through 2009, and again in 2011, in which he denied any fatigue or
shortness of breath or in which his lungs were clear and his heart rate was
regular in rate and rhythm.  R. 398, 403, 406, 432, 438, 440.  This evidence
provides support in the record for the ALJ's credibility finding.  Therefore,
the Court will not review the credibility determination.

Shinneman also argues the ALJ erred in not following Dr. Freeman's
opinions.  The Court disagrees.  The ALJ's decision not to accept Dr.
Freeman's opinions was supported by substantial evidence.  Dr. Freeman
conceded that Shinneman's condition did not meet Listing 4.02 for chronic
heart failure.  Dr. Freeman did not give an opinion that Shinneman met

Listing 4.02.  Instead, Dr. Freeman opined that Shinneman's condition

medically <u>equaled</u> the Listing because his combination of impairments left

him unable to independently initiate activities of daily living. (emphasis

added) R. 288.  Dr. Freeman made a credibility determination to accept

Shinneman's claim that he could only walk 100 yards without stopping.  R.

288.  The ALJ, however, found that Shinneman was not credible about the

extent of his physical limitations, and further, specifically relied on

Shinneman's admission to Dr. Trello that he engaged in a large number of

activities of daily living.  R. 26.  As explained above, the Court will not

disturb the ALJ's credibility finding.  The ALJ, therefore, properly rejected

Dr. Freeman's opinion that Shinneman was limited in his ability to

independently initiate activities of daily living.  As a result, the ALJ's

conclusion to reject Dr. Freeman's opinion that Shinneman's impairments

equaled Listing 4.02 was supported by substantial evidence.

Shinneman argues that the ALJ failed to adequately explain her

reasons for rejecting Dr. Freeman's opinion regarding Listing 4.02.  The

Court again disagrees.  The ALJ explained her rationale clearly and

succinctly:

> The undersigned has considered the opinion of the claimant's
> medical expert who alleged that the claimant's condition did
> equal Listing 4.02A, 2/B,1.  The echo did not document any
> diastolic failure.  Further, his activities of daily living are not very

seriously limited; the claimant reported to Dr. Trello that he is able to drive, cook, clean, grocery shop, and do laundry. Further, no doctor has concluded that the performance of an exercise test would present a significant risk to the individual.

R. 26 (citations to the record omitted).  The ALJ explained that the

evidence showed that Shinneman's impairments did not equal either

subparts (A) or (B) of Listing 4.02.  The explanation is sufficient to allow the

Court to trace the ALJ's reasoning.  See Scott v. Barnhart, 297 F.3d 589,

595 (7th Cir 2002).  The ALJ did not err in explaining the basis for this part

of her decision.

The ALJ also adequately explained her decision to reject

Dr. Freeman's RFC finding.  The ALJ explained that Dr. Freeman did not

connect his opinions to evidence in the record.  The ALJ also stated that

the medical records showed that Shinneman did not have a persistent

problem with shortness of breath since June of 2005.  The medical records

provide substantial evidence to support the ALJ's finding.  See R. 398, 403,

406, 432, 438, 440 (medical records from 2005-09, 2011, showing no

reports of breathing problems at office visits).  The ALJ adequately

explained her basis for rejecting Dr. Freeman's opinions.

Shinneman argues in the alternative that the ALJ erred in making any

RFC finding at all.  He argues that because she did not adopt either

Dr. Freeman's RFC opinion or the opinions of Drs. Gotway and Gonzalez, an evidentiary deficit existed.  He argues that the ALJ improperly made up her RFC assessment based on her own lay medical knowledge in the face of this deficit.  See Suide v. Astrue, 371 Fed. App'x 684, 690 (7th Cir. 2010). The Court again disagrees.   The ALJ made reasonable inferences based on the evidence in the record, including the medical evidence.  See Seamon, 364 F. App'x at 248.  The ALJ is directed to weigh and consider all the relevant evidence, not just adopt an opinion of one of the medical experts.  For example, the ALJ is specifically instructed to consider the impact of obesity when, as here, the claimant has that condition.  SSR 02-1p. The ALJ is instructed to include the credible evidence from the claimant and other lay witnesses at the relevant points in the Analysis, including her assessment of the claimant's RFC.  See e.g., 96-7p. Through this deliberative process, the ALJ's RFC assessment may often vary from the opinion of any specific physician or other medical source.  As discussed above, the ALJ went through the deliberative process and considered the relevant factors to arrive at Shinneman's RFC.  There was no error.

THEREFORE, this Court recommends that Plaintiff Shinneman's Amended Motion for Summary Judgment (d/e 20) should be DENIED, and Defendant Commissioner of Social Security's Motion for Summary

Affirmance (d/e 17) should be ALLOWED and the decision of the

Defendant Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and

Recommendation must be filed in writing with the Clerk of the Court within

fourteen days after service of a copy of this Report and Recommendation.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely

objection will constitute a waiver of objections on appeal.  See Video

Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local

Rule 72.2.

ENTER:   February 22, 2016


_____s/ Tom Schanzle-Haskins_____
UNITED STATES MAGISTRATE JUDGE